**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER EVANS, | ) | CASE NO. 1:17CV1047 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jennifer Evans, ("Plaintiff" or "Evans"), proceeding *pro se*, challenges the final

decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security

("Commissioner"), denying Evans' applications for Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends the

Commissioner's final decision be AFFIRMED.

**I.  PROCEDURAL HISTORY**

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

In January 2015, Evans filed applications for POD, DIB, and SSI, alleging a disability onset date of January 1, 2012 and claiming she was disabled due to bipolar disorder, post-traumatic stress disorder ("PTSD"), anxiety, herniated discs, "bad knees," and fibromyalgia. (Transcript ("Tr.") 14, 207, 209, 236.)  The applications were denied initially and upon reconsideration, and Evans requested a hearing before an administrative law judge ("ALJ").  (Tr. 150-156, 166-177, 178.)

On October 14, 2016, an ALJ held a hearing, during which Evans, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 63-89.)  On October 28, 2016, the ALJ issued a written decision finding Evans was not disabled.  (Tr. 14-27.)  The ALJ's decision became final on March 22, 2017, when the Appeals Council declined further review. (Tr. 1.)

On May 18, 2017, Evans, filed her *pro se* Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17, 18.)  Evans asserts the following assignments of error:

> (1)  The Administrative Law Judge appears to have abused his or her discretion.
>
> (2)  The decision is not supported by substantial evidence.
>
> (3)  We receive new and material evidence on the decision is contrary to the weight of all the evidence now in the record.

(Doc. No. 17.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Evans was born in March 1974 and was forty-two (42) years-old at the time of her

2

administrative hearing, making her a "younger" person under social security regulations.  (Tr. 25.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a consultant (sedentary, skilled, SVP 8); chief payroll supervisor (sedentary, skilled, SVP 8); and payroll clerk (semi-skilled, SVP 4).  (Tr. 25.)

**B.     Medical Evidence**

    **1.          Mental Impairments**

On February 5, 2013, Evans underwent an Adult Diagnostic Assessment with social workers Martha Yeager, BA, LSW and Don Cook, MSW, LISW-S.  (Tr. 286-294.)  She reported a history of substance abuse, including heroin, crack cocaine, and marijuana.  (Tr. 288.)  Evans desired treatment in order to become sober, address her heroin withdrawal issues, and decrease her depression symptoms.  (Tr. 286.)  She reported feeling terrible and indicated she had "to be clean, per Public Defender, to avoid a jail sentence" on four felony charges for writing bad checks.  (Tr. 286, 289.)  Evans stated "she has not done [any activities of daily living] because she cannot get out of bed unless she does drugs."  (Tr. 286.)  She attributed her drug use to her fibromyalgia and back pain.  (Tr. 292.)

With regard to her mental health symptoms, Evans reported increased depression over the past year and stated she "feels useless and hopeless all the time, cries all the time every day, no energy and motivation."  (Tr. 290.)  She also complained of anxiety attacks "a couple of times per week," which had been worsening over the past year.  (*Id.*)  Evans stated she could not relax, and reported constant fidgeting and racing thoughts.  (*Id.*)  She also reported mood swings and sleep problems.  (Tr. 291.)  Evans indicated she "gets too overwhelmed to function."  (Tr. 292.)

Evans was diagnosed with depression psychosis, unspecified, and combined drug dependency, unspecified; and assessed a Global Assessment of Functioning ("GAF") of 55,[2] indicating moderate symptoms. (Tr. 293.)

Several weeks later, Evans underwent an Initial Psychiatric Evaluation with Kathleen Christy, APRN-BC. (Tr. 296-300.) Evans reported she was "weaning herself off heroin." (Tr. 296.) She indicated she was "having problems sleeping at present with racing thoughts, can't relax, appetite comes and goes, concentration: not good at all." (*Id.*) Ms. Christy stated Evans was "very focused on fibromyalgia and believes that if she was not in pain she would not need drugs." (*Id.*) On mental status examination, Evans was cooperative but agitated, restless, and withdrawn. (Tr. 297.) Ms. Christy noted average eye contact and demeanor, pressured speech, a tangential thought process, and an angry, irritable, and depressed mood. (*Id.*) In addition, Ms. Christy found obsessional, guilty, preoccupied, and paranoid thought content. (*Id.*) She diagnosed postraumatic stress disorder ("PTSD") and combined drug dependency; and offered a differential diagnosis of "rule out" bipolar disorder. (Tr. 298.) She assessed a GAF of 55, indicating moderate symptoms. (*Id.*) Ms. Christy prescribed Seroquel. (Tr. 299.)

The record reflects Evans presented for mental health treatment on several occasions between March and December 2013. On March 4, 2013, Evans' Seroquel dosage was increased and she was prescribed Neurontin and a trial of Cymbalta. (Tr. 338-339.) Ten days later, it was

___

[2] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

noted Evans was "in Lake County jail."  (Tr. 336.)  It appears she was released on May 29, 2013 and presented for a counseling session on June 25, 2013.  (Tr. 328.)  She had not attended AA meetings and reported using drugs since her release.  (*Id.*)  Evans' speech was pressured and Ms. Christy described her as "markedly ill."  (Tr. 328-329.)  The following month, Evans was attending AA once per week and doing community service projects.  (Tr. 326.)  Ms. Christy continued to describe her as "markedly ill."  (Tr. 327.)

Evans regularly presented for mental health treatment in 2014, presenting to Ms. Christy on at least eight (8) occasions.  (Tr. 320-321, 318, 316-317, 314-315, 312-313, 310-311, 308-309, 306-307, 304-305.)  During each visit, in response to the question "how mentally ill is the patient at this time," Ms. Christy described Evans as "markedly ill."  (*Id.*)  Records from these visits are handwritten and often difficult to read but they appear to indicate Evans' medication was adjusted several times.  In July 2014, her Geodon dosage was increased.  (Tr. 316.)  In August 2014, Evans was "more depressed" and prescribed Wellbutrin.  (Tr. 312.)  The following month, Evans was depressed with low energy and continued on her medications.  (Tr. 310.)  In October 2014, Ms. Christy increased her Geodon dosage and prescribed Trazodone.  (Tr. 306.)  Throughout most of this time period, Evans is described as "stable."  (Tr. 317, 313, 309, 307.)  By December 2014, however, Evans was "symptomatic" with slightly pressured speech and reports of sleep problems and forgetfulness.  (Tr. 304-305.)

In 2015, Evans presented for mental health treatment on numerous occasions, both to physician assistant Pushpalatha Venkatarman, P.A., and professional clinical counselor Stephen J. Roos, PCC-S, LCDC III.  On March 6, 2015, Evans presented to Ms. Venkatarman with complaints of impaired balance, difficulty concentrating, impaired memory, and racing thoughts.

5

(Tr. 466-467.)  On examination, Ms. Venkatarman noted depressed, sad, and tired mood, and slurred thought process.  (*Id.*)  She diagnosed bipolar disorder, unspecified; assessed a GAF of 60, indicating moderate symptoms; and prescribed Propranolol to address Evans' balance issues.  (*Id.*)  In response to the question "how mentally ill is the patient at this time," Ms. Venkatarman answered "moderately ill."  (*Id.*)

Several weeks later, on March 26, 2015, Evans was "feeling better with propranolol" and "able to walk straight."  (Tr. 464-465.)  She continued to complain of racing thoughts but stated her mood swings were well-controlled.  (*Id.*)  On examination, Evans was happy, cheerful, and cooperative.  (*Id.*)  Ms. Venkatarman described her as alert and oriented but mildly depressed with short term memory problems.  (*Id.*)  She again diagnosed bipolar disorder, unspecified; assessed a GAF of 60; and described Evans as "moderately ill." (*Id.*)

In April 2015, Evans reported "being stable with her current medication."  (Tr. 461-462.)  She was not having significant mood swings or feeling restless, and was "still looking for a job, [but] finding it difficult . . . because of felonies."  (*Id.*)  On examination, Evans was cooperative with logical thought process and mild mood swings and mild depression.  (*Id.*)  She answered questions appropriately but indicated problems with short term memory.  (*Id.*)  Ms. Venkatarman described Evans as "moderately ill" and continued her on her medications (Neurontin, Cogentin, Wellbutrin, Trazadone, and Propranolol).  (*Id.*)

In July 2015, Evans was again noted as "stable with current medication."  (Tr. 459-460.)  She reported having difficulties with her memory and feeling restless.  (*Id.*)  Ms. Venkatarman noted Evans' thought process was "fair" and indicated her anxiety and depression was situational.  (*Id.*)  She diagnosed bipolar disorder and prescribed Geodon.  (*Id.*)

On September 3, 2015, Evans presented to counselor Mr. Roos with complaints of racing thoughts, memory loss and "issues with PTSD and abusive relationships in the past."  (Tr. 586-587.)  She also reported chronic pain due to fibromyalgia and back pain from a car accident in high school.  (*Id*.)  On examination, Evans was cooperative with average eye contact and motor activity, clear speech, logical thought process, and an average estimated intelligence.  (*Id*.)  She did not report any impairment in memory, attention, or concentration.  (*Id*.)  However, Mr. Roos also noted Evans was withdrawn with a constricted affect and depressed and anxious mood.  (*Id*.)

Evans returned to Mr. Roos on September 7 and October 1, 2015.  (Tr. 584-585, 613-614.)  On September 7, 2015, Evans had a euthymic mood and was not described as depressed or anxious.  (Tr. 584-585.)  She did, however, have a constricted affect and reported memory impairment.  (*Id*.)  On October 1, 2015, Evans reported doing community service at a local dog shelter and "look[ed] and sound[ed] very positive at this time."  (Tr. 613.)  She did not report memory impairment during this visit.  (Tr. 614.)

On October 28, 2015, Evans returned to Ms. Venkatarman.  (Tr. 611-612.)  She indicated decreased restlessness and memory impairment, but continued to complain of depression and anxiety.  (*Id.*)  Ms. Venkatarman described her as "moderately ill" and continued her on her medications.  (*Id*.)

On November 6, 2015, Mr. Roos noted Evans was "doing well, both in sobriety and emotionally."  (Tr. 609-610.)  Mental status examination findings were normal, with the exception of a constricted affect.  (*Id*.)  Several weeks later, on November 20, 2015, Evans "said she continues to be stable on her medication regime," but complained of constant neck and back pain.  (Tr. 607-608.)  Mental status examination findings were normal aside from a preoccupied

7

demeanor and constricted affect.  (*Id*.)  Evans did not report memory impairment during either of her November visits.  (Tr. 607-610.)

Evans' condition fluctuated during her three sessions with Mr. Roos in December 2015. (Tr. 601-606.)  On December 4, 2015, she was anxious and under stress due to her boyfriend's alcohol use.  (Tr. 605-606.)  At this visit, Evans was withdrawn and preoccupied with a constricted affect and depressed, anxious mood.  (*Id*.)  On December 18, 2015, however, Evans was "doing well" and "very happy" due to an upcoming visit with family.  (Tr. 603-604.)  Mental status examination findings were normal.  (*Id*.)  By the end of December 2015, Evans was again preoccupied and anxious with a constricted affect.  (Tr. 601-602.)  She did not report memory impairment during any of her December visits.  (Tr. 601-606.)

On January 8, 2016, Evans returned to Ms. Venkatarman.  (Tr. 598-599.)  She was "stable on her meds," but did report occasional auditory/visual hallucinations, mild depression and anxiety, and short term memory problems.  (*Id*.)  Later that month, Evans presented to Mr. Roos as "slightly withdrawn," preoccupied and "struggling in several areas."  (Tr. 596-597.)  She reported feeling "preoccupied with being approved for disability," but indicated she wanted to return to school to study chemical dependency counseling.  (*Id*.)  Evans did not report memory impairments during her January visits with Mr. Roos.  (Tr. 596-597, 594-595.)

In February 2016, Evans "made the difficult decision to change where she lives and with whom she associates."  (Tr. 590-591.)  She was withdrawn and preoccupied, and "said she wants to have the disability money to pay off court costs and restitution" stemming from her previous felony convictions.  (*Id*.)  The following month, Mr. Roos noted Evans had "greatly improved her situation" by "moving into a sober environment."  (Tr. 699.)  Mental status examination

8

findings were normal apart from a preoccupied demeanor and constricted affect. (Tr. 699-700.)

Treatment records reflect Evans' living situation caused significant stress over the next several months. On March 25, 2016, Evans was preoccupied, tired, anxious and stressed. (Tr. 697-698.) She reported difficulty finding housing, reporting she had been "staying with various people for days at a time." (*Id.*) Evans reported difficulty sleeping and "not eating very well," and was withdrawn and anxious with a constricted affect. (Tr. 695, 697-698.)

Evans continued to struggle with her housing situation in April 2016, "staying temporarily at random, unstable, and often dangerous places." (Tr. 693-694.) On April 8, 2016, Ms. Venkatarman and Mr. Roos each completed a "Certification of Disability," stating Evans was "disabled according to the HUD definition." (Tr. 718, 715.) In these Certifications, they described Evans as "a person with a mental impairment that impedes the ability to live independently, is expected to be of indefinite duration, and is of such a nature that could be improved by more suitable housing conditions." (*Id.*)

On May 12, 2016, Evans returned to Ms. Venkatarman for follow-up. (Tr. 701-703.) She reported her mood swings were "well controlled" and denied hypomanic/manic symptoms and depressive episodes. (*Id.*) Evans indicated "when she was dehydrated she was having delusions, hallucinations but feeling fine now." (*Id.*) On examination, Ms. Venkatarman noted Evans was alert and oriented to person, place and time with clear speech and fair thought process. (*Id.*) She also noted "occasional" auditory and visual hallucinations, and anxiety. (*Id.*) Ms. Venkatarman prescribed Vistaril, and continued Evan's other medications. (*Id.*)

On May 20, 2016, Evans reported to Mr. Roos that she had obtained housing at a halfway house. (Tr. 681-682.) Mr. Roos noted she was anxious and preoccupied with a constricted

9

affect.  (*Id*.)  Evans did not report any memory impairment during this visit.  (*Id*.)

Evans next returned to Mr. Roos on July 15, 2016.  (Tr. 679-680.)  He noted Evans was "somewhat withdrawn and in pain from a chronic back ailment and fibromyalgia," stating she "in obvious physical pain today."  (*Id*.)  Evans reported her probation was extended "because she has not paid court costs," and indicated she "desperately hopes for positive movement regarding disability payments, so she can be free of the legal system and have enough money to find a place to live."  (*Id*.)  On examination, she was withdrawn and preoccupied with a depressed mood and constricted affect.  (*Id*.)  Mr. Roos noted a logical thought process and indicated Evans did not report any memory impairment.  (*Id*.)

On August 8, 2016, Evans returned to Ms. Venkatarman.  (Tr. 711-712.)  She stated her mood swings were well controlled and her restlessness was "getting better," but she was stressed and depressed due to her financial problems.  (*Id*.)  On examination, Ms. Venkatarman noted occasional auditory/visual hallucinations and situational anxiety.  (*Id*.)  She adjusted Evans' medications, discontinuing Trazadone and increasing her Vistaril dosage.  (*Id*.)

Later that month, Evans presented to Mr. Roos and indicated she would be moving in with her boyfriend.  (Tr. 709.)  She stated she had  "few housing options at this time because she has no income," and "will naturally not be going to school at this time" for chemical dependency counseling classes.  (*Id*.)  On examination, Evans had average eye contact and motor activity, clear speech, and logical thought process with an anxious mood and constricted affect.  (*Id*.)  She did not report any memory impairment.  (*Id*.)

On November 14, 2016, Evans returned to Ms. Venkatarman.  (Tr. 771-772.)  She denied manic/hypomanic symptoms and depressive episodes, but reported "problems with memory,

10

concentration, [and] ongoing [visual hallucinations] [that] come in the way of her attention."
(*Id*.)  Ms. Venkatarman increased Evans' dosages of both Vistaril and Benztropine.  (*Id*.)

On February 13, 2017, Evans reported feeling "pretty good."  (Tr. 775-776.)  She again denied manic/hypomanic symptoms and depressive episodes but stated she was "still having [auditory/visual hallucinations], making her daily functioning difficult."  (*Id*.)  Evans also indicated she was having memory and concentration problems.  (*Id*.)  On examination, Ms. Venkatarman found Evans was alert and oriented to person, place and time, with clear speech and fair thought process, insight, and judgment.  (*Id*.)  She also determined Evans' mood/affect, thought content/perception, and cognition (orientation, memory, concentration, fund of knowledge) were all within normal limits.  (*Id*.)  Ms. Venkatarman changed Evans' diagnosis to schizoaffective disorder, bipolar type, noting Evans had a history of manic, depressive episodes and hallucinations "during the course of manic, depressive episodes and in between."  (*Id*.)  She continued Evans on her medications.  (*Id.*)

### 2. Physical Impairments

The first medical record cited by the parties relating to Evans' physical impairments is dated October 16, 2014, over two and a half years after her January 2012 onset date.  (Tr. 505-510.)  On that date, Evans began treatment with primary care physician Elizabeth Turbett, M.D., presenting for a comprehensive physical exam.  (*Id.*)  Evans complained of back pain and "all over pain."  (Tr. 505.)  She reported suffering from scoliosis, lower back pain, and "bulging discs."  (*Id*.)  Evans stated she had been treated by a "Dr. Lee,"[3] who diagnosed her with fibromyalgia and prescribed Lyrica.  (*Id*.)  She stated she "does not exercise because it hurts to

---

[3] The parties do not direct this Court's attention to any treatment notes from "Dr. Lee."

11

walk" and requested an increase in her Lyrica dosage.  (*Id.*)  On examination, Dr. Turbett noted as follows:

> Musculoskeletal: Gait is normal with toe and heel walking and no foot drop . Extremities: Full Range of motion and strength throughout.  Inspection of the cervical spine reveals normal findings.  There is no tenderness to palpation.  Range of Motion: normal flexion, extension, rotation and lateral bending. Inspection of the lumbar spine reveals normal lumbar lordosis. There is minimal tenderness of the lumbar area. Range of motion of lumbar spine is limited in flexion and extension. The lumbar spine is stable.  Bilateral Straight leg raise is negative.
> * * *

(Tr. 507.)  Dr. Turbett also noted normal motor strength and tone, normal reflexes, and no edema. (*Id.*)  She diagnosed backache, unspecified; "unspecified myalgia and myositis;" and gastroesophogeal reflux disease ("GERD").  (Tr. 508.)  Dr. Turbett continued Evans on her current medications and dosages, and advised her to exercise five times per week for twenty minutes each time.  (Tr. 509.)

Evans returned to Dr. Turbett on December 4, 2014 with complaints of urinary frequency. (Tr. 497-499.)  Dr. Turbett diagnosed a urinary tract infection and prescribed antibiotics.  (*Id.*) She also increased Evans' Lyrica dosage.  (*Id.*)

Later that month, on December 22, 2014, Evans presented to Louis DeMicco, D.O., with complaints of neck and back pain.  (Tr. 665-666.)  She reported that "10 years ago she had an MRI of the lumbar spine and had some herniated disc," and was treated with nerve blocks.  (*Id.*) On examination, Dr. DeMicco noted pain with rotation and flexion in Evan's neck, and pain to palpation in her lumbar spine.  (*Id.*)  He also noted good muscle strength in her upper and lower extremities, and negative straight leg raise.  (*Id.*)  Dr. DeMicco assessed cervical neck pain, thoracic back pain, lumbar back pain, and history of lumbar disc disease.  (*Id.*)  He referred her for physical therapy and chiropractic care.  (*Id.*)  Dr. DeMicco indicated Evans was "going to

stick with her over the counter medications," noting she alternates between Ibuprofen and Naproxen.  (*Id.*)

Evans presented for physical therapy on December 29, 2014.  (Tr. 664.)  She complained of  neck and upper back pain that "at times can cause her significant discomfort." (*Id.*)  The physical therapist (whose name is illegible) noted pain to palpation along her cervical and thoracic spines, as well as reduced muscle strength.  (*Id.*)

On January 22, 2015, Evans returned to Dr. DeMicco for follow up.  (Tr. 663.)  She reported doing physical therapy twice per week and indicated it was helping her lower back pain. (*Id.*)  On examination, Dr. DeMicco noted pain and tenderness along Evans' lumbar spine.  (*Id.*) Straight leg raise was negative.  (*Id.*)  He recommended Evans continue her chiropractic care and physical therapy, while he attempted to get insurance approval for an MRI of Evan's lumbar spine.  (*Id.*)

The record reflects Evans returned for physical therapy on February 16, 2015.  (Tr. 662.) She indicated that, since beginning therapy, "she has improved and was feeling better until she fell on ice about four days ago."  (*Id.*)  The therapy again noted pain to palpation along Evans' cervical and thoracic spines, as well as reduced muscle strength.  (*Id.*)

On February 23, 2015, Evans returned to Dr. DeMicco.  (Tr. 661.)  She indicated she had been doing physical therapy twice per week and saw a chiropractor once per week.  (*Id.*)  Evans stated her pain was an 8 on a scale of 10 in her lumbar back, and a 6 out of 10 in her neck and mid back.  (*Id.*)  Dr. DeMicco noted tenderness across Evans' cervical and lumbar spines, but stated she was neurologically intact with negative straight leg raise testing.  (*Id.*)

Evans returned to Dr. Turbett on March 3, 2015.  (Tr. 494-496.)  She "first complained

13

about back pain, but she has had this for many years." (Tr. 494.) Evans also reported urinary frequency and urgency, burning with urination, and nausea. (*Id*.) Dr. Turbett diagnosed a urinary tract infection and prescribed antibiotics. (Tr. 495-496.)

Three days later, on March 6, 2015, Evans presented to the emergency room ("ER") with complaints of "general weakness," lightheadedness, and slurred speech. (Tr. 373, 377, 392.) A chest x-ray taken that date was compatible with right lung infection or inflammation. (Tr. 426.) An EKG showed sinus tachycardia. (Tr. 390.) She was diagnosed with an acute lower urinary tract infection and pneumonia, prescribed antibiotics, and discharged home. (Tr. 373, 431.)

On March 23, 2015, Evans returned to Dr. DeMicco for follow up regarding her neck and back pain. (Tr. 660.) She stated both her neck and back were still "bothering her," and indicated her pain was a 6 on a scale of 10. (*Id*.) On examination, Dr. DeMicco noted "some tenderness across the cervical and lumbar spine with pain with range of motion." (*Id*.) He also found she was neurologically intact with negative straight leg raise. (*Id*.) Dr. DeMicco recommended she continue with therapy and chiropractic care, but stated "her pain does not seem to be improving despite the therapy." (*Id*.)

Evans presented for physical therapy on April 2, 2015. (Tr. 659.) She reported she was "feeling better" but continuing to have difficulty with bending and lifting activities. (*Id*.) The physical therapist noted signs and symptoms "indicative of [major muscle] spasms along upper and mid back, as well as overall deconditioning." (*Id*.)

On April 13, 2015, Evans returned to Dr. DeMicco. (Tr. 658.) She reported physical therapy and chiropractic care "does help." (*Id*.) On examination, Dr. DeMicco noted tenderness, muscle spasm, and pain with range of motion. (*Id*.) He indicated Evans was going to continue

14

with over the counter pain medication, physical therapy, and chiropractic treatment.  (*Id.*)

Evans presented to Dr. Turbett on April 14, 2015.  (Tr. 487-490.)  She complained of cough, dysuria, and urinary frequency.  (Tr. 487.)  A chest x-ray taken that date showed "clearing of diffuse pneumonitis in the right lung" as compared to the March 6, 2015 x-ray.  (Tr. 358, 485.)  Dr. Turbett assessed urinary tract infection and pneumonia, and prescribed antibiotics.  (Tr. 488-489.)

Evans returned to physical therapy on May 1, 2015.  (Tr. 657.)  She reported "feeling better" but stated she continued to have difficulty with head turning.  (*Id.*)

On May 11, 2015, Evans presented to Dr. DeMicco with complaints of continuing pain in her neck and lower back, which she rated a 6 on a scale of 10.  (Tr. 656.)  Examination revealed tenderness across Evans' neck.  (*Id.*)  Straight leg raise testing was, again, negative.  (*Id.*)

On August 5, 2015, chiropractor Justin Wirick, D.C. , submitted a letter regarding Evans' physical impairments, follows:

> Ms. Jennifer Evans was under my care for full spine complaints January 2015 through May 2015.  At that time, she exhibited consistent lower [lumbar spine] dystxn and recurrent pain that interfered with her abilities to perform her daily activities.  She ceased treatment in May 2015 because she ran out of medical benefits; however, her symptoms had not stabilized at that time.  I cannot comment on her current physical status since 3 months have passed since last eval[uation], however she was functionally compromised [due to] lumbar-based [symptoms] in May 2015.

(Tr. 655.)[4]

On August 21, 2015, Evans returned to Dr. Turbett with complaints of "fibromyalgia aned all over pain" that seemed to be worsening.  (Tr. 479-481.)  She stated she walks every day, but cannot stand or sit for prolonged periods.  (Tr. 479.)  Evans requested an increase in her

---

[4] The parties do not direct this Court's attention to any treatment notes from Dr. Wirick.

Lyrica dosage because "she does not feel it is as effective and has pain all over on some days."

(*Id.*)  Evans also requested "a letter for her lawyer stating she has significant disability and is

unable to work."  (*Id.*)  Dr. Turbett indicated "I have previously received notice from her lawyer

and stated I would not do testing to determine her disability and told her the same thing today."

(*Id.*)

On examination, Dr. Turbett found "no pain at random trigger points when done as part

of rest of exam."  (Tr. 480.)  She also noted no tenderness to palpation of the lumbar spine,

normal strength, and negative bilateral straight leg raise.  (*Id.*)  Dr. Turbett assessed backache,

unspecified; and "unspecified myalgia and myositis."  (*Id.*)  She increased Evans' Lyrica dosage

and referred her to a chiropractor.  (*Id.*)

Evans returned to Dr. Turbett on November 24, 2015 for a comprehensive physical exam.

(Tr. 616-620)  She complained of back pain and "all over pain."  (Tr. 616.)  On examination, Dr.

Turbett noted:

> Musculoskeletal: Gait is normal with toe and heel walking and no foot drop .
> Extremities: Full Range of motion and strength throughout.  Inspection of the
> cervical spine reveals normal findings. There is no tenderness to palpation.  Range
> of Motion: normal flexion, extension, rotation and lateral bending.  Inspection of
> the lumbar spine reveals normal lumbar lordosis. There is minimal tenderness of
> the lumbar area.  Range of motion of lumbar spine is limited in flexion and
> extension.  The lumbar spine is stable.  Bilateral Straight leg raise is negative.
> * * *

(Tr. 618.)  She also noted normal muscle strength and tone and no edema.  (*Id.*)  Dr. Turbett

assessed GERD; dorsalgia, unspecified; fibromyalgia; and hypercholesterolemia.  (Tr. 619.)  She

continued Evans on her medications and encouraged her to exercise five times per week.  (Tr.

619-620.)

The record reflects Evans presented for physical therapy on February 18, 22, and 24,

16

2016.  (Tr. 726-728.)  On each of these visits, she rated her pain a 7 on a scale of 10.  (*Id.*)  She reported difficulty sleeping and "having a hard time doing chores around the house."  (Tr. 726, 727.)

On March 1, 2016, Evans presented to the ER with complaints of chest pain that radiated down her left arm, weakness, cough, and shortness of breath.  (Tr. 622, 627, 637.)  A chest x-ray taken that date showed no acute findings.  (Tr. 640, 652.)  Evans was diagnosed with acute bronchitis; prescribed antibiotics, prednisone and albuterol; and discharged home.  (Tr. 622, 640, 642.)

Evans presented for physical therapy on four occasions in March 2016.  (Tr. 722-725.)  On each visit, she rated her pain a 7 or 8 on a scale of 10.  (*Id.*)  Evans reported difficulty lifting and turning her neck.  (Tr. 724, 725.)  By mid-March, she reported improved sleep.  (Tr. 722.)

On March 29, 2016, Evans presented to Dean Pahr, D.O., for evaluation of her back pain.  (Tr. 766-767.)  She reported she had been "hurting a very long time chronically," and rated her pain a 7 on a scale of 10.  (*Id.*)  Examination findings were normal.  (*Id.*)  A lumbosacral spine x-ray taken that date was unremarkable.  (Tr. 768.)  Dr. Pahr assessed lumbar radiculitis, fibromyalgia, and chronic pain syndrome.  (Tr. 767.)

On April 22, 2016, Evans presented to the ER with complaints of shortness of breath, fever, sweating, nausea, dizziness, blurry vision, weakness, and visual hallucinations.  (Tr. 729, 730, 736, 744.)  A chest x-ray taken that date was normal.  (Tr. 749-750.)  Evans was diagnosed with acute urinary tract infection, prescribed antibiotics, and discharged home in stable condition.  (Tr. 750.)

Evans returned to Dr. Turbett on May 3, 2016.  (Tr. 670-672.)  She complained of urinary

frequency and irritation. (*Id.*) Dr. Turbett diagnosed a urinary tract infection, and prescribed antibiotics. (*Id.*)

Evans returned to physical therapy on July 7 and 14, 2016. (Tr. 720-721.) She rated her pain a 6-7 on a scale of 10, and stated "she has difficulty working because she is usually in so much pain." (*Id.*)

## C.    State Agency Reports

### 1.    Mental Impairments

On May 18, 2015, Evans underwent a psychological consultative examination with Herschel Pickholtz, Ed.D. (Tr. 447-454.) Evans reported a history of depression, mood swings and anxiety "since her 20's until now." (Tr. 449.) She stated she was currently taking psychiatric medication but still experienced mild to moderate symptoms, including depression, mood swings, anxiety, and PTSD. (*Id.*) Specifically, Evans stated she experiences depressive symptoms twice per week lasting 18 hours per occurrence; mood swings once or twice per week lasting 6 hours per day; and anxiety symptoms twice per month lasting 30 minutes per occurrence. (*Id.*) She also acknowledged a history of severe cocaine and heroin abuse occurring between 2009 and 2013. (Tr. 449-450.) Evans participated in court-ordered rehab twice for drugs and stated she still attends 12-step meetings four times per week. (Tr. 450.)

In terms of activities of daily living, Evans indicated she took care of her hygiene daily, changed her clothing daily, and washed her hair three times per week. (Tr. 452.) She reported she vacuumed once a week, mopped twice a month, swept the floors twice per week, did the laundry once per week, cooked dinner twice per week, shopped for food twice per month, cleaned the bathroom, and washed the dishes. (*Id.*) Evans reported talking on the phone daily to

18

her mom, sponsor, and other people in the program.  (*Id.*)  She babysat for her sponsor's child

(aged 4 months) twice a week for 6 hours and attended religious services.  (Tr. 453.)

On mental status examination, Evans was very pleasant, "neat and clean," dressed

appropriately and cooperative with good eye contact.  (Tr. 451.)  Dr. Pickholtz found she "had no

difficulties in terms of understanding and responding to the questions and directives presented to

her."  (*Id.*)  She had normal speech and thought content, although Dr. Pickholtz noted her tone of

voice "appeared to be just a little bit sad."  (*Id.*)  He stated Evans "did complain of some

difficulties in terms of focusing and memory, yet at the same time, her abilities for long-term

memory fell within the average range and she had no problems in terms of attention and

concentration relative to digits forward and backwards recall."  (*Id.*)  Dr. Pickholtz also noted her

persistence and pace fell within the average range.  (Tr. 449.)

Evans' affect was "a little bit constricted" and her mood "a little bit depressed."  (Tr.

451.)  There were no significant signs of autonomic anxiety, however, Evans reported feeling "a

little bit fidgety" and experiencing flashbacks about once a month about a previous traumatic

experience.  (*Id.*)  In terms of her memory and cognitive functioning, Dr. Pickholtz concluded as

follows:

> She was well oriented to time, place and person. She was able to recall her birth
> date, the current date and her age.  Her abilities to recall her long-term history fell
> within the average range.  Her overall abilities to recall five objects after a 20
> minute lapse of time fell within the low average range.  Her overall levels of
> intellectual functioning based upon administration of the mental status evaluation
> yielded an estimated IQ falling within the average range. * * * Her current
> capacities to recall a sequence of numbers fell within the average range, as she was
> able to recall 6 digits forwards and 4 digits backwards. * * * Her abilities for recall
> of long term history based upon remembering common historical and cultural
> information fell within the average range. * * * Based upon the responses to these
> operations and the descriptions of her daily living activities, her estimated levels
> of intelligence fell within the average range. There was a mild discrepancy between

19

the responses to the evaluation and premorbid levels of intellectual functioning in accordance with prior levels of academic achievement and work history.

(Tr. 452.)

Dr. Pickholtz diagnosed (1) unspecified bipolar disorder without psychotic features (exacerbated by addictive processing in the past) currently mild to moderate; (2) posttraumatic stress disorder, mild; (3) unspecified anxiety disorder, mild; (4) cocaine use disorder, severe, in remission; (5) opioid use disorder, severe, in remission; and (6) unspecified neurocognitive disorder, mild, probably related to drug usage and/or to her other psychiatric conditions.  (Tr. 453-454.)  He concluded Evans had a "slight impairment at worst" in her abilities and limitations in understanding, remembering, and carrying out instructions; maintaining attention, concentration, persistence and pace to perform simple tasks and to perform multi-step tasks; and in responding to supervision and coworkers in a work setting.  (Tr. 454.)  With regard to her ability to respond to work pressure, Dr. Pickholtz found "[h]er capacities to handle the stresses and pressures of work comparable to the type of work she did in the past appear to be somewhat impaired but not preclusive of work as long as she stays on her medications."  (Tr. 454.)

On June 9, 2015, state agency psychologist Joseph Edwards, Ph.D., reviewed Evans' medical records and completed a Psychiatric Review Technique ("PRT").  Dr. Edwards found Evans had mild limitations in her activities of daily living and in maintaining social functioning and concentration, persistence or pace.  (Tr. 99.)  Citing the results of the CE with Dr. Pickholtz, he found: "Given the objective medical evidence in file, claimant's mental health conditions have no more than a minimal effect on her ability to work.  She has not used [drugs] since [2]013 and continues to participate in treatment.  Not severe."  (*Id.*)

On October 1, 2015, state agency psychologist Carl Tishler, Ph.D., reviewed Evans'

medical records and completed a PRT. (Tr. 128-129.)  He reached the same conclusions as Dr.

Edwards. (*Id.*)

### 2.      Physical Impairments

On April 16, 2015, Evans underwent a physical consultative examination with Dorothy

Bradford, M.D.  (Tr. 437-445.)  Evans complained of low back pain and reported a history of

herniated disks in the lower back and fibromyalgia.  (Tr. 441.)  She stated she "can't sit 20

minutes, stand five minutes, or lift anything." (*Id.*)  Dr. Bradford found Evan's self-reported

history to be "somewhat reliable." (*Id.*)  On examination, Evans was in no acute distress.  (Tr.

442.)  She had normal station, posture, and gait, moved easily, and did not use a mobility device.

(Tr. 443.)  Evans had full range of motion and normal stability, strength and tone in her neck and

bilateral upper extremities. (*Id.*)  In her bilateral lower extremities, Dr. Bradford noted Evans

had no misalignment, tenderness or masses; normal stability, strength and tone; and moderately

decreased range of motion at the hips and knees. (*Id.*)  Evans' reflexes and sensation were

normal. (*Id.*)  Dr. Bradford reviewed a lumbar spine x-ray dated taken that date that revealed

moderately severe degenerative disc at L5/S1 and mild degenerative joint disease at the facet

joints.  (Tr. 444-445.)  She concluded as follows:

> Claimant alleges low back pain and fibromyalgia. On exam she looks healthy and
> moves easily. Gait is normal.  Strength and sensation are normal and no trigger
> points were elicited.  There was no tenderness over the paraspinal muscles or
> spinous processes.  There was decreased ROM at the hips and knees due to [lower
> back pain]. In my medical opinion her x-ray and exam support her allegations of
> back pain but probably not to the degree she alleges. There is no evidence for
> fibromyalgia.  She should be restricted to sedentary activity.

(Tr. 444.)

On June 1, 2015, state agency physician Anton Freihofner, M.D., reviewed Evans'

medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment for the period October 16, 2014 to the present.  (Tr. 101-102.)  Dr. Freihofner found Evans could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id.*)  He concluded she could frequently balance and kneel; occasionally stoop, crouch, crawl and climb ramps/stairs; and never climb ladders/ropes/scaffolds.  (*Id.*)  Dr. Freihofner also determined Evans had unlimited push/pull capacity and no manipulative, visual, communicative, or environmental limitations.  (*Id.*)  Lastly, he found "there is insufficient medical evidence to evaluate claimant's physical health conditions between 1/1/12 and 10/15/14."  (Tr. 102.)

On December 8, 2015, state agency physician Esberdado Villaneuva, M.D., reviewed Evans' medical records and completed a Physical RFC Assessment.  (Tr. 131-132.)  He reached the same conclusions as Dr. Freihofner. (*Id.*)

**D.      Hearing Testimony**

During the October 14, 2016 hearing, Evans testified to the following:

- She graduated from high school.  (Tr. 70.)  She has prior work experience as a consultant, payroll manager, and payroll clerk.  (Tr. 72-75.)  Each of these jobs were sedentary desk jobs, i.e., mostly sitting with no lifting/carrying more than 10 pounds.  (*Id.*)  She lost her last job as a payroll clerk because of her memory problems and difficulty concentrating.  (Tr. 72.)

- She had no current source of income and was staying with friends.  (Tr. 70.)  She had a driver's license but did not have a car.  (*Id.*)  Sometimes she used the bus.  (*Id.*)

- She cannot work because of her back pain, fibromyalgia, and her memory problems.  (Tr. 76.)  She is "in pain all the time."  (*Id.*)  She cannot concentrate and experiences memory loss and racing thoughts.  (*Id.*)  She also has "pretty bad anxiety and PTSD."  (*Id.*)

- Her memory problems are "the main thing."  (Tr. 84.)  She cannot work because

22

she cannot remember directions or "how to do things." (Tr. 76.)  She does not
believe she could remember simple instructions.  (Tr. 80.)  She "gets confused
pretty easily."  (Tr. 82.)  Her doctors cannot find a cause for her memory loss.
(*Id.*)

- She sees a chiropractor for her back pain, and has participated in physical
therapy.  (Tr. 78.)  Her chiropractic treatment helps "a little bit," but only for a
few days.  (Tr. 79.)  The physical therapy did not seem to help.  (*Id.*)  She takes
Naproxen and Aleve or Ibuprofen for her back pain.  (Tr. 81.)  She has suffered
from back pain for some time.  (Tr. 80.)  She received injections in her back
about ten years ago but "they didn't work."  (*Id.*)

- She can walk for 15 minutes, stand for five minutes, and sit for 30 minutes.  (Tr.
83.)  She does not do much on a typical day and "lays down a lot."  (Tr.  79, 83.)

- She receives mental health treatment, including counseling, for her bipolar
disorder, anxiety, panic attacks, depression and PTSD.  (Tr. 81-82.)  Treatment
is helping.  (*Id.*)

- She had problems with drug addiction, beginning in approximately 2011.  (Tr.
77.)  She does not believe her drug habit impacted her ability to perform her job
at that time because "I had these [mental health and physical] problems before I
started taking" drugs.  (*Id.*)  She had been sober for over three years on the date
of the hearing.  (Tr. 77, 82.)

- The only chore she can do is washing the dishes.  (Tr. 79.)  She cannot vacuum
or clean the bathroom.  (Tr. 83.)  She has difficulty bending.  (*Id.*)

The VE testified Evans had past work as a consultant (sedentary, skilled, SVP 8), chief

payroll supervisor (sedentary, skilled, SVP 7), and payroll clerk (sedentary, semi-skilled, SVP 4).

(Tr. 85.)  The ALJ then posed the following hypothetical question:

[A]ssume a hypothetical individual of the claimant's age and education with
the past jobs that you described.  Further assume that this individual is limited
as follows.  This is a light[5] exertional hypothetical with the following additional

---

[5] "Light work" is defined as follows: "Light work involves lifting no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.
Even though the weight lifted may be very little, a job is in this category when it requires
a good deal of walking or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls. To be considered capable of performing
a full or wide range of light work, you must have the ability to do substantially all of

23

limitations.  This individual can occasionally climb ramps and stairs, never
ladders, ropes, or scaffolds, can frequently balance * * * .  Occasionally stoop,
frequently kneel, and occasionally crouch and crawl.  Moreover, this person is
limited to performing simple tasks with no production rate pace requirements,
and can tolerate routine workplace changes.  Can this hypothetical individual
perform any of the past jobs that Ms. Evans performed?

(Tr. 86.)

The VE testified the hypothetical individual would not be able to perform Evans' past

work as consultant, chief payroll supervisor, or payroll clerk, but would be able to perform other

representative jobs in the economy, such as marker (light, unskilled, SVP 2), copy machine

operator (light, unskilled, SVP 2), and mail clerk (light, unskilled, SVP 2).  (Tr. 86-87.)

The ALJ then asked the VE to assume the same hypothetical as above with the additional

limitation that "this person will be off task 10% of the time in an eight-hour workday."  (Tr. 87.)

The VE testified there would be no jobs for such a hypothetical individual.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

---

these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that
 "since frequent lifting or carrying requires being on one's feet up to two-thirds of a
workday, the full range of light work requires standing or walking, off or on, for a total of
approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

24

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Evans was insured on her alleged disability onset date, January 1, 2012 and remained insured through December 31, 2015, her date last insured ("DLI.")  (Tr. 14.) Therefore, in order to be entitled to POD and DIB, Evans must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2012, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, affective disorder, anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404. 1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the
residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations. The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can frequently balance and kneel. The claimant can occasionally stoop, crouch, and crawl. The claimant is limited to simple tasks that require no production rate pace. The claimant can tolerate only routine workplace changes.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565

26

and 416.965).

7.     The claimant was born on March ** 1974 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963.)

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2012, through the date of the decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-26.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec*., 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

28

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Step Two

Evans first argues the ALJ erred in failing to find her fibromyalgia, PTSD, and bi-polar disorder to be "severe" impairments at step two of the sequential evaluation.[6]  (Doc. No. 17-2 at 3, Tr. 274.)  With regard to her fibromyalgia, she claims:

> I did have the testing to confirm.  I gave the info to [social security] and my lawyer. It was at Oaktree Clinic, Dr. Lee.  It is not my fault they obviously did not respond.

(Tr. 274.)  With regard to her PTSD and bipolar, Evans argues generally the ALJ should have

---

[6] Evans' *pro se* Brief on the Merits is one page in length.  (Doc. No. 17.)  Therein, she lists three grounds for relief but fails to develop them in the body of her Brief, stating only "there are a lot of inaccuracies" in the ALJ decision.  (*Id*.)  Evans does, however, attach an annotated copy of the ALJ decision, which includes her handwritten comments and objections.  (Doc. No. 17-2.)  In addition, Evans references "Exhibit #13E" of the Transcript, which consists of an 8 page handwritten letter to the Appeals Council requesting review of the ALJ decision on various grounds.  (Tr. 274-281.)  The Court has reviewed both the annotated ALJ decision attached to Evans' brief and "Exhibit 13E" in identifying her specific arguments herein.

found these impairments to be "severe," noting she experiences anxiety/panic attacks "very often, usually about once a week or two." (Tr. 275.)

The Commissioner argues the ALJ properly found Evans' fibromyalgia was not a medically determinable impairment at step two. (Doc. No. 18 at 9.) She notes "the record contains no records from Dr. Lee and no medical evidence to support the alleged diagnosis." (*Id*.) The Commissioner also emphasizes Dr. Turbett's finding Evans showed no pain at random trigger points, and Dr. Bradford's conclusion there was no evidence of fibromyalgia. (*Id*.) The Commissioner does not, however, address Evans' arguments regarding her PTSD and bipolar disorder.

The Court will address each of Evans' arguments in turn, below.

### *Medically Determinable Impairment– Fibromyalgia*

The Social Security Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques. *See* 20 CFR § 404.1521; Social Security Ruling ("SSR") 96–4P, 1996 WL 374187, at *1 (SSA July 2, 1996). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings. *Id.*

Further, the regulations require "evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment." SSR 06–03p, 2006 WL 2329939 at *2

30

(SSA Aug. S, 2006).[7] "[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone." SSR 96–4p, 1996 WL 374187 at *1 (SSA July 2, 1996). Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." *Id*. *See also* 20 C.F.R. §§ 404.1529(b) and 416.929(b) ("Your symptoms . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."). *See also Torrez v. Comm'r of Soc. Sec*., 2017 WL 749185 at * 6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec*., 2017 WL 655402 at * 8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017). The claimant bears the burden of establishing the existence of a medically determinable impairment. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.") *See also Kavalousky v. Colvin*, 2013 WL 1910433 at * 7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Here, the ALJ determined, at step two, that Evans suffered from the severe impairments of degenerative disc disease of the lumbar spine, affective disorder, and anxiety disorder. (Tr. 16.) The ALJ determined Evans' fibromyalgia did not constitute a "medically determinable

[7] The Court notes SSR 06-03p was rescinded on March 27, 2017. This rescission is effective for claims filed on or after March 27, 2017. *See* "Rescission of SSRs 96-2p, 96-5p, and 06-3p," 2017 WL 3928298 at * 2 (SSA March 27, 2017). Here, Evans filed her applications in January 2015, prior to the rescission of SSR 06-03p.

impairment" for the following reasons:

> I have considered the allegations regarding fibromyalgia pursuant to the requirements of Social Security Ruling 12-2.  In this case, the evidence fails to demonstrate that the claimant's symptoms and medical signs met the criteria to be considered a medically determinable impairment of fibromyalgia.  Although her current primary care physician adopted this diagnosis by the claimant's historical report, when she indicated a prior physician, simply "Dr. Lee," had diagnosed fibromyalgia, the evidence fails to demonstrate that her current physician, Elizabeth Turbett, MD, identified the necessary supportive clinical findings.  Although she reported "widespread pain," there was no evidence of pain in all four quadrants, and physical examinations were negative for tenderness aside from the lumbar spine area.  The treating physician noted no pain at random tender points during an August 21, 2015 office visit.  (Exhibit 7F, p. 4).  There was also no evidence of workup to rule out other potential causes for her symptoms, probably because her complaints were generally intermittent in nature and she sought only conservative, sporadic treatment.  Further, the consultative examining physician, Dorothy Bradford, MD, indicated there was "no evidence" of fibromyalgia upon reviewing the claimant's history and the physical examination findings. (Exhibit 4F).  I cannot consider these symptoms alone, as the regulations require that the evidence demonstrate a medically determinable impairment that would reasonably cause the alleged symptoms and limitations.  Therefore, I find the evidence fails to support that fibromyalgia is a medically determinable impairment, despite the multiple medical histories in the record identifying that impairment.

(Tr. 17.)

The ALJ's finding is supported by substantial evidence.  The ALJ appropriately acknowledged and relied on S.S.R. 12-2p, 2012 WL 3104869 (SSA July 25, 2012) in evaluating Evans' claim of fibromyalgia.  (Tr. 17.)  That Ruling describes fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."  SSR 12–2p, 2012 WL 3104869 at *2.  SSR 12–2p explains fibromyalgia is a "common syndrome" and that a person's symptoms must be considered when the agency decides if the individual has a medically determinable impairment ("MDI") of fibromyalgia ("FM").  *Id*.  Pursuant to the Ruling, "FM is an MDI when it is established by appropriate medical evidence," and the disease "can be the basis for a finding

of disability." *Id*.  Only a licensed physician can provide evidence of an MDI of FM, but the physician's diagnosis alone is insufficient.  *Id*.  Rather, the evidence must "document that the physician reviewed the person's medical history and conducted a physical exam."  *Id*.  The agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities."  *Id.*

The Agency will find a person has a medically determinable impairment of fibromyalgia if a physician diagnosed fibromyalgia and provides the evidence described under § II.A or § II.B of the Ruling, and the physician's diagnosis is not inconsistent with the other evidence in the individual's case record.  *Id*.  Under § II.A., the agency "may find that a person has an MDI of FM if he or she has all three of the following":

> 1.  A history of widespread pain-that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted (or that persisted) for at least 3 months' and which "may fluctuate in intensity and may not always be present;"
>
> 2. "At least 11 positive tender points on physical examination" which must be found in specified locations;[8] and

---

[8]  SSR 12–2p requires a finding of "[a]t least 11 positive tender points [which] must be found bilaterally (on the left and right sides of the body) and both above and below the waist" and which are located on each side of the body.  SSR 12–2p, 2012 WL 3104869 at *3.  The tender points are located at the following 18 sites: Occiput (base of the skull); Low cervical spine (back and side of the neck);  Trapezius muscle (shoulder); Supraspinatus muscle (near the shoulder blade);  Second rib (top of the rib cage near the sternum or breast bone); Lateral epicondyle (outer aspect of the elbow); Gluteal (top of the buttock); Greater trochanter (below the hip); and Inner aspect of the knee.  *Id*.  The Ruling provides that in performing the testing, "the physician should perform digital palpation with an approximate force of 9 pounds (approximately the amount of pressure needed to blanch the thumbnail of the examiner). The physician considers a tender point

3. Evidence that other physical and mental disorders that could cause the symptoms or signs were excluded, such as "imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor)."

*Id.* at *2–3.  Alternatively, a person may be found to have a medically determinable impairment of fibromyalgia under § II.B of SSR 12-2p if he or she has all three of the following criteria:

1. A history of widespread pain as described under § II. A.;

2. "Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome;" and

3. Evidence that "other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded."

*Id.* at 3.  Co-occurring conditions include "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome."  *Id.* at fn. 10.

Here, substantial evidence supports the ALJ's determination the record failed to contain medical evidence demonstrating Evans' fibromyalgia is a medically determinable impairment. While Evans asserts a previous doctor, "Dr. Lee," diagnosed her with fibromyalgia, the record before the ALJ did not contain any treatment records from Dr. Lee explaining the medical basis for this alleged diagnosis.[9]  Moreover, and as the ALJ correctly notes, Evans' treatment records

---

to be positive if the person experiences any pain when applying this amount of pressure to the site."  *Id.* at § II.A.2.b.

[9]  Evans claims "it is not her fault" Dr. Lee's treatment records were not made part of the record before the ALJ.  It is well established, however, that the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999); *Warner v. Comm'r of Soc. Sec.* 375 F.3d 387, 390 (6th Cir. 2004) (stating the claimant bears the burden of proof at steps one through four of the sequential evaluation process); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir.

fail to contain clinical findings sufficient to satisfy the requirements of SSR 12-2p, §§ II.A. or B.

Specifically, neither Dr. Turbett's nor Dr. DeMicco's treatment notes document (1) widespread pain in all quadrants of Evans' body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted (or that persisted) for at least 3 months; (2) at least 11 positive tender points in the specified locations discussed *supra*; or (3) evidence other physical and mental disorders that could cause the symptoms or signs were excluded.  To the contrary, in August 2015, Dr. Turbett specifically found "no pain at random trigger points."  (Tr. 480.)  In addition, physical examination findings in October 2014 and November 2015 were relatively benign, with no tenderness in Evans' extremities and only minimal tenderness of the lumbar area.  (Tr. 507, 618.)  Dr. DeMicco's treatment records noted pain to palpation in Evans' cervical and lumbar spines, but failed to document widespread pain in all four quadrants of Evan's body or the presence of any trigger points.  (Tr. 665-666, 663, 661, 660, 656.)  Moreover, while Dr. Pahr assessed fibromyalgia, he did not indicate the presence of trigger points or widespread pain and, indeed, physical examination findings were normal.  (Tr. 766-767.)  Finally, in April 2015, consultative examiner Dr. Bradford determined Evans' "strength and sensation are normal and no trigger points were elicited."  (Tr. 444.)  She further found "no tenderness over the paraspinal muscles or spinous processes" and concluded "there is no evidence for fibromyalgia."  (*Id.*)

Further, Evans fails to cite any medical records suggesting other physical or mental disorders that could cause her fibromyalgia symptoms were excluded.  She also fails to direct this

---

2003) ("Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments").  Moreover, the record reflects Evans was represented by counsel during administrative proceedings below.

Court's attention to any treating physician opinion endorsing physical functional limitations resulting from her fibromyalgia.

While Evans claims the ALJ erred because "Dr. Lee" originally diagnosed fibromyalgia and Dr. Turbett subsequently adopted this diagnosis, "a diagnosis of [fibromyalgia] is not sufficient to establish a [medically determinable impairment] pursuant to SSR 12-2p." *Walters v. Comm'r of Soc. Sec.*, 2015 WL 1851451 at * 7 (S.D. Ohio April 22, 2015), *report and recommendation adopted* by 2015 WL 5693640 (S.D. Ohio Sept. 29, 2015). Rather, a fibromyalgia diagnosis must be supported by the criteria set forth in § II.A. or § II.B. of SSR 12-2p to satisfy the requirements of that Ruling. Here, Evans has not demonstrated the Ruling's requirements were satisfied by the treatment records of any of her physicians, including Drs. Turbett, DeMicco, and Pahr. Accordingly, and for all the reasons set forth above, the Court finds substantial evidence supports the ALJ's determination Evans' fibromyalgia did not constitute a "medically determinable impairment" during the relevant period is supported by substantial evidence.

### *Non-Severe Impairments*

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of social security regulations. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii). As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities ..." 20 CFR § 404.1520(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). Examples include: (1) physical functions

such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*.

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985). *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec*., 2009 WL 4981686 at * 2 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 2008 WL 508008 at * 5.

As noted above, the ALJ herein determined, at step two, that Evans suffered from the severe impairments of degenerative disc disease of the lumbar spine, affective disorder, and anxiety disorder. (Tr. 16.) The ALJ did not specifically discuss whether Evans' PTSD and/or

bipolar disorder constituted "severe" impairments at step two.  At steps three and four, however, the ALJ discussed evidence regarding Evans' mental impairments, including her self-reports, hearing testimony, and the medical and opinion evidence.  (Tr. 17-25.)  In particular, the ALJ acknowledged Evans' reports she suffers from anxiety, panic attacks, depression, memory loss, difficulty concentrating, and racing thoughts.  (*Id*.)  The ALJ, however, noted mental status examination findings often indicated no abnormal thought processes, distractibility, or significant memory deficits.  (Tr. 23.)  The ALJ also cited recent treatment notes indicating Evans' mental health symptoms "were stable, including well-controlled mood swings and restlessness, despite having some situational stressors that were making her depressed and stressed."  (Tr. 24.)

While it would have been preferable for the ALJ to expressly consider whether Evans' PTSD and bipolar disorder were "severe" at step two, any error in his failure to do so is harmless. As noted above, the ALJ proceeded at step four of the sequential evaluation process to consider the cumulative effects of Evans' physical and mental impairments, both severe and non-severe. The record reflects Evans testified about her PTSD and bipolar disorder during the October 2016 hearing.  (Tr. 76, 81-82.)  At step four, the ALJ indicated he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (Tr. 20.)  Moreover, the ALJ expressly acknowledged both Evans' self-reports and the medical evidence regarding her mental impairments, including her mood swings, racing thoughts, anxiety, and memory/concentration deficits.  (Tr. 17-25.)  The ALJ accommodated Evans' mental impairments in the RFC, limiting her to simple tasks that require no production rate pace, and routine workplace changes.  (Tr. 20.)

Accordingly, the Court finds the ALJ considered Evans' PTSD and bipolar disorder at

later steps in the decision and, therefore, any error at step two is harmless.  This assignment of error is without merit.

### RFC and the Weighing of the Medical Opinion Evidence

In her brief on the merits, Evans argues generally that "the decision is not supported by substantial evidence."  (Doc. No. 17.)  She claims "there are a lot of inaccuracies in the report which make a huge difference in determining a decision," and directs this Court's attention to her handwritten letter to the Appeals Council.  (*Id.*)  In that letter (*see* Tr. 274-281), Evans challenges many of the ALJ's specific factual findings regarding the nature and severity of both her physical and mental impairments.  (Tr. 274-281.)  With regard to her physical impairments, she claims the ALJ failed to adequately account for her severe pain, weakness, and instability.  (*Id.*)  Evans states she "hurts everywhere" and "has tried everything" (including physical therapy, medication, and chiropractic care) but is nonetheless unable to work.  (*Id.*)  She claims the only reason she received routine, conservative treatment is because she lacked insurance and/or transportation for much of the relevant time period.  (*Id.*)  Evans also asserts the ALJ should not have relied on Dr. Bradford's examination because Dr. Bradford only examined her one time and was an agency doctor.  (*Id.*)

With regard to her mental impairments, Evans argues the ALJ understated the severity of both her anxiety and her concentration/memory deficits.  (*Id.*)  She claims she suffers anxiety/panic attacks once or twice per week, rarely comes out of her room, and feels very uncomfortable around people.  (*Id.*)  Evans also claims the inconsistent statements noted in the ALJ decision were the result of her memory issues, and not intentional.  (*Id.*)  Finally, she objects to Dr. Pickholtz's opinion on the grounds he only examined her on one occasion, was not her

39

doctor, and was, therefore, not credible.  (*Id*.)

The Commissioner argues the ALJ properly assessed Evans' RFC "based on the whole record, including the medical evidence, and substantial evidence supports this finding."  (Doc. No. 18 at 10.)  In particular, the Commissioner notes the ALJ properly relied on the fact Evans sought and received only routine, conservative treatment for her impairments, requiring no hospitalization or surgery for her physical impairments.  (*Id.* at 11.)  She also notes Evans' physical examinations were "relatively unremarkable" and emphasizes Dr. Turbett declined to provide a letter regarding Evans' disability.  (*Id*. at 11-12.)  The Commissioner asserts the ALJ properly relied on the state agency physicians' opinions in restricting Evans to a reduced range of light work.  (*Id*. at 13.)

With regard to Evans' mental impairments, the Commissioner argues the ALJ asserts the ALJ properly relied on the fact Evans' mental status examination findings were generally unremarkable and that she was able to engage in a wide range of daily activities, including light household chores, grocery shopping, cooking, and self-care.  (*Id*. at 14.)

Taken together, the Court considers Evans' brief and handwritten letter as asserting the RFC is not supported by substantial evidence, either with respect to her physical or mental limitations.  The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

40

must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96-8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p 1996 WL 374184 at * 7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her*, 203 F.3d at 391.

### Physical Impairments

At step two, the ALJ determined Evans suffered from the severe physical impairment of degenerative disc disease of the lumbar spine.  (Tr. 16.)  After determining she did not meet or equal the requirements of a Listing at step three, the ALJ continued at step four to consider Evans' self-reports and hearing testimony, the medical evidence, and the opinion evidence regarding her physical impairments.  (Tr. 17-25.)  The ALJ noted Evans' testimony she is "in pain all the time" and suffers from back pain that limits her ability to sit, stand, walk and lift. (Tr. 20.)  The decision also acknowledged Evans' testimony her treatment "is only minimally

41

effective, including chiropractic visits, physical therapy, and Naproxen, and over the counter NSAID medication she receives by prescription." (*Id*.)

The ALJ determined, however, "the objective evidence and treatment history fail to corroborate [Evans'] allegations of inability to sit, stand, or walk, or to lift 'any weight,' as she reported at the hearing." (Tr. 21.) The ALJ acknowledged the April 2015 lumbar x-ray showing moderate degenerative disc disease but noted consistently normal physical examination findings, including "normal strength, sensation, and gait in the lower extremities, with no evidence of radiculopathy resulting from these changes, including negative straight leg raising bilaterally." (*Id*.) He also noted "there was no evidence that [Evans] required or received a prescribed assistive device, despite her current allegations of limited mobility and inability to stand more than five minutes at a time." (*Id*.) The ALJ also observed Evans' treatment had been routine and conservative with no ER visits or hospitalizations for her chronic pain issues. (*Id*.) Finally, the ALJ noted Evans "alleged a long-standing history of back pain, which is inconsistent with her current reports of disabling limitations, as there was no objective evidence of a worsening of her degenerative disc disease and the claimant worked for many years at levels far above substantial gainful activity levels despite having chronic back pain." (*Id*.)

The ALJ then weighed the opinion evidence as follows:

As for the opinion evidence, no treating physician offered an opinion regarding the claimant's work-related physical limitations. The primary care physician, Dr. Turbett, routinely declined to provide a letter regarding disability, and her treatment was generally for the claimant's acute concerns, such as urinary tract infections or colds, rather than ongoing, intensive management of her pain or mobility difficulties. (7F, 10F, 13F).

Justin Wirick, DC, who previously provided chiropractic care for the claimant, provided a letter on August 5, 2015, indicating she was "functionally compromised due to lumbar based symptoms in May 2015," the last time he treated her. (Exhibit

42

12F, p. 2).  This opinion does not provide specific information regarding the claimant's physical limitations, and therefore it is not useful in assessing the degree of her work-related difficulties.

In the absence of a treating source opinion, I have considered the opinion of the consultative examining physician, Dr. Bradford, who examined the claimant on April 15, 2015.  There have been no additional x-rays or other diagnostic studies since that time, and physical examinations have remained stable since that time. As noted above, Dr. Bradford opined there was no evidence of fibromyalgia, based on lack of findings of tenderness combined with review of the claimant's history. The physical examination on that date demonstrated normal strength, sensation, and stability throughout the extremities, with some decreased range of motion secondary to lumbar spine pain, but negative neurological signs including bilateral straight leg raising.  There was no tenderness throughout the upper or lower extremities. The consultative physician opined the claimant "should be restricted to sedentary activity," but this appeared to be based heavily on the claimant's subjective allegation of pain. Even Dr. Bradford acknowledged "her x-ray and exam support her allegations of back pain but probably not to the degree she alleges."(Exhibit 4F, p.9).

Considering this equivocal statement, as well as the objective evidence throughout the period demonstrating no more than conservative, routine treatment for her pain complaints, I find Dr. Bradford 's opinion is not supported by the weight of the evidence, and give more weight to the conclusion of the State agency consultant who found the claimant was capable of performing a range of light exertional activity. (Exhibit 5A/6A). The DDS physician's opinion is supported by the relatively unremarkable physical findings despite the degenerative findings on x-ray. This opinion is also consistent with the claimant's ability to carry out a wide range of activities of daily living, including light household chores, grocery shopping, cooking, and self-care, as well as carry out her court-ordered community service hours at a local dog shelter, which conflict with her testimony that she is unable to lift "anything."

(Tr. 22.)  The ALJ formulated the following physical limitations in the RFC:  "[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations.  The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  The claimant can frequently balance and kneel.  The claimant can occasionally stoop, crouch, and crawl."  (Tr. 20.)

Substantial evidence supports the physical limitations set forth in the RFC.  As the ALJ

43

correctly noted, physical examination findings were largely normal.  For example, in October 2014, Dr. Turbett noted normal gait, full range of motion of Evans' extremities and cervical spines, minimal tenderness to the lumbar area, negative straight leg raise, normal motor strength and tone, normal reflexes, and no edema.  (Tr. 507.)  In February and March 2015, Dr. DeMicco noted tenderness across Evans' cervical and lumbar spines but found she was neurologically intact with negative straight leg raise testing.  (Tr. 660, 661.)  In August 2015, Dr. Turbett found "no pain at random trigger points," no tenderness to palpation of Evans' lumbar spine, normal strength, and negative bilateral straight leg raise.  (Tr. 480.)  Several months later, in November 2015, Dr. Turbett again noted normal gait, full range of motion of Evans' extremities and cervical spines, minimal tenderness to the lumbar area, negative straight leg raise, normal motor strength and tone, normal reflexes, and no edema.  (Tr. 618.)  In March 2016, examination findings were again normal and a lumbosacral spine x-ray was unremarkable.  (Tr. 766-768.) The ALJ also corrected noted that, despite Evans' claims of extreme limitations in standing and walking, there is no evidence she ever used, or that any of Evans' treating sources ever prescribed, an assistive device.

The ALJ's finding Evans' treatment had been routine and conservative is also supported by substantial evidence.  The record reflects Evans' treatment for her chronic pain consisted of medication, physical therapy, and chiropractic care.  Evans does not direct this Court's attention to any evidence indicating she underwent injections during the relevant time period or was referred for surgical consultation.[10]

---

[10] Evans argues the ALJ erred in relying on her routine, conservative treatment because she lacked insurance and/or transportation during portions of the relevant time period. This argument is without merit.  The ALJ's reliance on Evan's routine, conservative treatment is based on the nature and extent of her treatment, not the frequency of her

Finally, the ALJ correctly notes there is no treating physician opinion in the record regarding Evans' physical functional limitations.  In her handwritten letter, Evans suggests the RFC is not supported by substantial evidence because the ALJ erred in his evaluation of the opinions of chiropractor Dr. Wirick, and consultative examiner Dr. Bradford.  The Court disagrees.

With regard to Dr. Wirick, it is well-established a chiropractor is not an acceptable medical source under the Commissioner's regulations.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 530 (6th Cir. 1997).  Rather, a chiropractor is an "other source," which is not subject to the "good reasons" requirement of the treating physician rule.  *See* 20 CFR §§ 416.902(a)(1) -(8), 416.927(a)(1), 416.927(f).  *See also Flores v. Berryhill*, 2017 WL 6882551 at * 16 (N.D. Ohio Dec. 15, 2017); *Jones v. Colvin,* 2014 WL 4594812 at * 12 (N.D. Ohio Sept. 12, 2014); *Salah v. Comm'r of Soc. Sec*., 2013 WL 3421835 at * 10 (N.D. Ohio July 8, 2013).  Nonetheless, Social Security Ruling 06–03p[11] notes that information from "other sources" such as chiropractors "are important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06–03p, 2006 WL 2329939 at *2–3 (Aug. 9, 2006).  *See also* 20 CFR § 416.927(c).  Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion."

---

doctor visits.

[11] As noted *supra,* SSR 06-03p was rescinded on March 27, 2017.  This rescission is effective for claims filed on or after March 27, 2017.  *See* "Rescission of SSRs 96-2p, 96-5p, and 06-3p," 2017 WL 3928298 at * 2 (SSA March 27, 2017).  Here, Evans filed her applications in January 2015, prior to the rescission of SSR 06-03p.

45

*Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.2007). *See also McKitrick v. Comm'r of Soc. Sec.*, 2011 WL 6939330 at * 12–13 (N.D. Ohio Dec.30, 2011); *Kerlin v. Astrue*, 2010 WL 3937423 at * 7 (S.D. Ohio March 25, 2010). *See also* 20 CFR § 416.927(c),(f).

Here, the Court finds the ALJ's analysis of Dr. Wirick's opinion satisfies the regulatory requirements for considerations of opinions from "other sources."  The ALJ expressly acknowledged the opinion of Dr. Wirick that Evans was "functionally compromised due to lumbar based symptoms in May 2015," but rejected it on the grounds it "does not provide specific information regarding the claimant's physical limitations, and therefore it is not useful in assessing the degree of her work-related difficulties."  (Tr. 22.)  The Court finds the ALJ did not err in discounting Dr. Wirick's opinion on this basis given the lack of further explanation or clarity regarding the meaning of the term "functionally compromised."[12]

In sum, because Dr. Wirick is an "other source," the ALJ was not required to accord any particular weight to his opinion nor was he required to provide "good reasons" for rejecting it. Rather, the ALJ was required only to evaluate Dr. Wirick's opinion using the applicable factors set forth in the regulations.  *See Cruse*, 502 F.3d at 541.  The Court finds the ALJ properly evaluated and discounted Dr. Wirick's opinion for the reasons set forth above.

The Court also finds the ALJ properly discounted Dr. Bradford's opinion Evans "should be restricted to sedentary activity."  (Tr. 22.)  In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program

---

[12] In this regard, the Court also notes the record does not appear to contain any of Dr. Wirick's treatment notes, which might have provided some basis or support for his opinion.

46

physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i).[13]  Nonetheless, because "State

agency medical and psychological consultants and other program physicians, psychologists, and

other medical specialists are highly qualified physicians, psychologists," ALJs must consider

their findings and opinions.  *Id*.  When doing so, an ALJ "will evaluate the findings using the

relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical

specialty and expertise in our rules, the supporting evidence in the case record, supporting

explanations the medical or psychological consultant provides, and any other factors relevant to

the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in

the decision the weight given to the opinions of a State agency medical or psychological

consultant or other program physician, psychologist, or other medical specialist" unless a treating

physician's opinion has been accorded controlling weight.  *Id.*

 Here, the ALJ properly rejected Dr. Bradford's opinion on the grounds it "appeared to be

based heavily on the claimant's subjective allegation of pain," and was inconsistent with

"objective evidence throughout the period demonstrating no more than conservative, routine

treatment for her pain complaints."  (Tr. 22.)  As discussed above, Evans' treating physicians

consistently noted normal physical examination findings, including normal gait, full range of

motion of her extremities and cervical spine, minimal tenderness to the lumbar area, negative

straight leg raise, normal motor strength and tone, normal reflexes, and no edema.  (Tr. 507, 660,

661, 480, 618, 766-767.)  Moreover, Dr. Bradford's own examination of Evans was similarly

unremarkable.  Specifically, Dr. Bradford noted Evans was in no acute distress, had normal

---

[13] On January 18, 2017, SSA altered the regulations pertaining to medical opinions as to
claims filed after March 27, 2017.  *See* 82 Fed. Reg. 5844; 82 Fed. Reg. 15132.  Here,
Evans' applications were filed prior to March 27, 2017.

station, posture, and gait, moved easily, and did not use a mobility device.  (Tr. 442-443.)  She also found Evans had (1) full range of motion and normal stability, strength and tone in her neck and bilateral upper extremities; (2) normal stability, strength and tone in her bilateral lower extremities; (3) normal reflexes and sensation; and (4) moderately decreased range of motion at the hips and knees.  (Tr. 442-445.)  In light of the above, the Court finds the ALJ did not err in discounting the Dr. Bradford's opinion on the grounds it was inconsistent with the objective medical evidence.

Finally, the Court finds the ALJ did not err in according greater weight to the opinions of state agency physicians Drs. Freihofner and Villaneuva that Evans could perform a reduced range of light work, based on the normal physical examination findings noted above and Evans' "ability to carry out a wide range of activities of daily living."  (Tr. 22.)  As the ALJ correctly notes, during her psychological consultative exam, Evans reported she took care of her hygiene and changed her clothes daily, vacuumed once a week, mopped twice a month, swept the floors twice per week, did the laundry once per week, cooked dinner twice per week, shopped for food twice per month, cleaned the bathroom, and washed the dishes.  (Tr. 452.)  While Evans now claims she "never said that," it was not unreasonable for the ALJ to rely on Dr. Pickholtz's notes to the contrary.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err in his evaluation of the medical and opinion evidence and, further, that substantial evidence supports the physical limitations set forth in the RFC.

### Mental Impairments

At step two, the ALJ also determined Evans suffered from the severe mental

48

impairments of affective disorder and anxiety disorder.  (Tr. 16.)  After determining she did not

meet or equal the requirements of Listings 12.04 and 12.06 at step three, the ALJ continued at

step four to consider Evans' self-reports and hearing testimony, the medical evidence, and the

opinion evidence regarding her mental impairments.  (Tr. 17-25.)  The ALJ first noted Evans'

testimony the "main reason" she is unable to work is due to short-term memory loss.  (Tr. 20.)

He also acknowledged her complaints of difficulty concentrating, racing thoughts, and anxiety.

(Tr. 20, 22-23.)

The ALJ discounted Evans' allegations of disabling mental health symptoms, however,

on the grounds "the objective clinical evidence and treatment history . . . fail to fully corroborate

her reports and testimony." (Tr. 22.)  In particular, he noted inconsistent statements Evans made

regarding the reasons for losing jobs and her unsuccessful efforts to find work, stating these

inconsistencies suggested "her drug use played a more prominent role in her unemployment than

she admitted at the hearing."  (Tr. 22-23.)  The ALJ also found "[a]lthough records from Beacon

Health did record intermittent complaints of the claimant having mild short-term memory loss,

the mental status examinations generally indicated her cognition was within normal limits, with

no abnormal thought processes, inattention, distractibility, or significant memory deficits on

exam."  (Tr. 23.)  He found the record indicated Evans experienced "some situational anxiety and

depression due to personal stressors, but generally she maintained the ability to interact well with

others, and maintained intact cognition for interactions and carrying out her daily activities." (*Id.*)

The ALJ weighed the opinion evidence as follows:

As for the opinion evidence, I note that the claimant's therapist, Stephen Roos,
LPCC-S, and her mental health physician 's assistant, Pushpalatha Venkataraman,
PAC, completed form letters addressed to the Department of Housing and Urban
Development (HUD).  These statements noted the claimant "is disabled according

49

to the HUD definition," as "a person with a mental impairment that impedes the ability to live independently, is expected to be of indefinite nature, and is of such a nature that could be improved by more suitable housing conditions." (4/8/20 16, Exhibit 16F, 17F).

I can accord little weight to these opinions, for several reasons.  As an "other" source, these opinions are still entitled to consideration with respect to the severity and frequency of the claimant's work-related limitations, but these form letters are conclusory in nature and do not address any specific objective findings or other evidence that would support the disability conclusion.  Further, I am not bound by the determinations of other government agencies regarding disability, as the Social Security Administration has its own standards, regulations, and policy to determine whether an individual is capable of work activity.  Finally, the conclusion of Mr. Roos and Ms. Venkataraman that the claimant is "disabled" is inconsistent with their contemporaneous treatment notes and observations, including that the claimant had normal cognition, maintained sobriety, and had no impairment of memory or concentration. (Exhibit 15F, p. 4).  On August 8, 2016, the prescribing physician assistant noted her symptoms were stable, including well-controlled mood swings and restlessness, despite having some situational stressors that were making her depressed and stressed. (Exhibit 15F, p. 5).  There was no evidence documented in either source's treatment notes to support that the claimant was unable to function independently.

* * *

I give more weight to the clinical findings and observation of the treating sources at Beacon Health, including Global Assessment of Functioning (GAF) scores indicating functioning in the mild to moderate range of impairment at 55 to 60 (Exhibit 6F, p. 11), as well as ongoing observations of stability of depression, anxiety, and restlessness with medication. As noted above, the evidence of subsequent treatment rendered the opinion of the State agency and consultative psychologists to be less persuasive , as those sources opined the claimant had no more than "mild" work-related mental limitations.

(Tr. 23-24.)  The ALJ included the following mental limitations in the RFC: "The claimant is limited to simple tasks that require no production rate pace.  The claimant can tolerate only routine workplace changes."  (Tr. 20.)

Substantial evidence supports the physical limitations set forth in the RFC.  While Evans' mental health symptoms fluctuated somewhat, mental status examination findings were

50

largely normal with consistent treatment and medication.  For example, in March 2015, Evans'

mood swings were well-controlled and she was cheerful and cooperative on examination.  (Tr.

464-465.)  The following month, she was cooperative with logical thought process and exhibited

only mild depression.   (Tr. 461-462.)  In September, October and November 2015, Mr. Roos

found Evans was depressed and anxious but nonetheless cooperative with average eye contact and

motor activity, clear speech, logical thought process, and no reported impairment in memory,

attention, or concentration.  (Tr. 586-587, 613-614, 609-610, 607-608.)  Although Evans reported

increased stress due to financial problems and difficulty finding housing, the record reflects Evans

consistently reported her mood swings were well-controlled and denied hypomanic/manic

symptoms and depressive episodes.  (Tr. 701-702, 771-772, 775-776.)  Ms. Venkatarman

generally found Evans to be stable on her medications and described her anxiety and depression

as either mild or "situational" in nature.  (Tr. 598-599, 771-772.)  Indeed, in the last treatment

note in the record, Ms. Venkatarman found Evans' mood/affect, thought content/perception, and

cognition (orientation, memory, concentration, fund of knowledge) were all within normal limits.

(Tr. 775-776.)

Likewise, during her May 2015 psychological consultative examination, Dr. Pickholtz

found Evans had normal speech and thought content with appropriate eye contact and no

significant signs of autonomic anxiety.  (Tr. 451.)  He also found she had "no difficulties in terms

of understanding and responding to questions and directives presented to her" and, further, that

her persistence and pace fell within the average range.  (Tr. 449, 451.)

The ALJ also correctly noted Evans' was consistently assessed GAF scores between 55

and 60, reflecting moderate symptoms.  (Tr. 293, 298, 464-465, 466-467.)  As noted *supra*, the

ALJ accommodated Evans' moderate mental health symptoms in the RFC by restricting her to simple tasks with no production rate pace, and only routine workplace changes. (Tr. 20.)

In her handwritten letter, Evans suggests the ALJ erred because he failed to accord greater weight to the opinions of physician assistant Ms. Venkataraman and therapist Mr. Roos that she is "disabled according to the HUD definition," as "a person with a mental impairment that impedes the ability to live independently, is expected to be of indefinite nature, and is of such a nature that could be improved by more suitable housing conditions." (Tr. 23.)

This argument is without merit. Neither Ms. Venkataraman or Mr. Roos are "acceptable medical sources" pursuant to social security regulations and, therefore, the ALJ's evaluation of their opinions is not subject to the "good reasons" requirement of the treating physician rule. *See* 20 CFR §§ 416.902(a)(1)-(8), 416.927(a)(1), 416.927(f). Here, the ALJ expressly acknowledged the opinions of Ms. Venkataraman and Mr. Roos but accorded them little weight on the grounds they were (1) "conclusory in nature and do not address any specific objective findings or other evidence that would support the disability conclusion;" (2) based on the HUD (rather than social security) definition of disability; and (3) inconsistent with contemporaneous treatment notes and observations, "including that the claimant had normal cognition, maintained sobriety, and had no impairment of memory or concentration." (Tr. 24.)

The ALJ did not err in discounting these opinions for the reasons set forth above. As the ALJ correctly noted, neither Ms. Venkataraman or Mr. Roos opine as to the existence of any specific mental functional limitations and, instead, simply offer the unexplained conclusion that Evans is disabled.[14] Moreover, these sources' opinion of disability is "according to the HUD

---

[14] The Court further notes, that according to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory

definition," which the ALJ correctly notes is distinct from a finding of "disability" under social security regulations.  Finally, substantial evidence supports the ALJ's conclusion the opinions of Ms. Venkataraman or Mr. Roos are inconsistent with contemporaneous treatment notes in the light of the normal mental status examination findings discussed above.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err in his evaluation of the medical and opinion evidence and, further, that substantial evidence supports the mental limitations set forth in the RFC.

### VE testimony

Evans next argues remand is required because "the impartial vocational expert, hired by the Social Security Administration, states there are no jobs that I can do based on her experience and training."  (Doc. No. 17 at 1.)  She also claims the ALJ should have considered how many of the jobs identified by the VE were available in Cleveland, as opposed to the national economy. (Doc. No. 17-2 at 13.)

The Commissioner asserts both arguments are without merit.  With regard to the first argument, the Commissioner argues "Plaintiff is likely referring to the expert's response to a hypothetical question that contained additional limitations that were not included in the RFC finding."  (Doc. No. 18 at 18.)  She maintains this argument fails because the ALJ is not required

---

definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  Thus, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we  will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

53

to rely on a VE's response to limitations he or she rejected.  (*Id.*)  With regard to Evans' second

argument, the Commissioner argues the ALJ properly found there were significant jobs available

in the *national* (as opposed to local) economy at step five.  (*Id.*)

The Court agrees with the Commissioner.  First, Evans' argument the VE testified "there

were no jobs" she could perform is without merit.  A hypothetical question must precisely and

comprehensively set forth every physical and mental impairment that the ALJ accepts as true and

significant.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

Where the hypothetical question is supported by evidence in the record, it need not reflect

unsubstantiated allegations by the claimant.  *See Blacha v. Sec'y of Health & Human Servs.*, 927

F.2d 228, 231 (6th Cir. 1990).  In fashioning a hypothetical question to be posed to a VE, the ALJ

is required to incorporate only those limitations that he accepts as credible.  *Griffeth v. Comm'r of

Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230,

1235 (6th Cir. 1993)).

Here, the record reflects the ALJ first asked the VE to consider the following

hypothetical:

> [A]ssume a hypothetical individual of the claimant's age and education with the
> past jobs that you described.  Further assume that this individual is limited as
> follows.  This is a light exertional hypothetical with the following additional
> limitations.  This individual can occasionally climb ramps and stairs, never
> ladders, ropes, or scaffolds, can frequently balance * * * .  Occasionally stoop,
> frequently kneel, and occasionally crouch and crawl.  Moreover, this person is
> limited to performing simple tasks with no production rate pace requirements,
> and can tolerate routine workplace changes.  Can this hypothetical individual
> perform any of the past jobs that Ms. Evans performed?

(Tr. 86.)

The VE testified the hypothetical individual would not be able to perform Evans' past

54

work as consultant, chief payroll supervisor, or payroll clerk, but would be able to perform other representative jobs in the economy, such as marker, copy machine operator, and mail clerk.  (Tr. 86-87.)  The ALJ then asked the VE to assume the same hypothetical as above with the additional limitation that "this person will be off task 10% of the time in an eight-hour workday."  (Tr. 87.) The VE testified there would be no jobs for such a hypothetical individual.  (*Id.*)

As the Commissioner correctly notes, the ALJ only incorporated the limitations set forth in the first hypothetical in the RFC, and did not include the 10% off task limitation that was added in the second hypothetical.  (Tr. 20.)  Thus, the VE's testimony that no jobs existed with the additional limitation that the individual would be off task 10% of the time is not relevant to Evans because the ALJ did not adopt and incorporate it into the RFC.  *See Griffeth*, 217 Fed. App'x at 429 (finding that, in fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible).  Moreover, Evans cites no specific medical or opinion evidence supporting a 10% off task limitation in the RFC.

The Court also finds the ALJ did not err in finding "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (Tr. 25-26.)  The determination of whether work exists in significant numbers can be determined with reference to either the national economy or a local/regional area.  *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999). Under the statute, work exists in the national economy when it exists in significant numbers either in the region where the claimant lives "or in several other regions of the country."  20 C.F.R §§ 404.1566(a), 416.966(a). "It does not matter whether work exists in the immediate area in which you live."  20 C.F.R. §§ 404.1566(a)(1), 416.966(a)(1).  Therefore, "the Commissioner need not show that a significant number of jobs exists in the local economy, only that the claimant is

55

capable of performing other jobs existing in the national economy." *Geiger v. Apfel,* 2000 WL 1257184 at *2 (6th Cir. 2000) *See also Riggs on behalf of Riggs v. Comm'r of Soc. Sec*., 2017 WL 821672 at * 5 (S.D. Ohio March 2,2017); *Brown v. Comm'r of  Soc. Sec*., 2015 WL 4644910 at * 11 (N.D. Ohio Aug. 4, 2015).

Here, at step five, the ALJ found Evans could perform the jobs of marker with 40,000 jobs in the national economy, copy machine operator with 45,000 jobs in the national economy, and mail clerk with 89,000 jobs in the national economy.  (Tr. 26.)  As noted above, it was not error for the ALJ to rely on the number of jobs in the national (as opposed to local) economy in determining there were jobs that exist in significant numbers for purposes of social security regulations.

Accordingly, the Court finds the ALJ did not err in his evaluation of the VE testimony.

### Sentence Six Remand

Finally, Evans argues this matter should be remanded in light of new opinion evidence regarding her mental impairments.  (Doc. No. 17.)  Specifically, Evans relies on a May 8, 2017 letter from Ms. Venkataraman stating Evans is "not able to work at all due to the mental health symptoms of schizoaffective disorder, bipolar type."  (Doc. No. 17-1.)  The Commissioner argues this letter does not warrant remand or reversal because it does not qualify as material evidence. (Doc. No. 18 at 17-18.)

Ms. Venkarataman's letter is dated May 8, 2017 and, therefore, was not before the ALJ at the time of his October 28, 2016 decision.  The Sixth Circuit has repeatedly held that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g).  *Id.  See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 717 (6th Cir. July 9, 2013) (stating "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand").  Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357.  Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'"  *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir.1988)).  *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (noting evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec.*, 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same).  Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the

57

administrative hearing.  *See Prater v. Comm'r of Soc. Sec.*,235 F. Supp.3d 876, 880 (N.D. Ohio 2017).  *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357.  *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)).  This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11.  *See also Bass*, 499 F.3d at 513.  The burden of showing that a remand is appropriate is on the claimant.  *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).[15]

The Court finds remand is not appropriate under Sentence Six based on Ms. Venkarataman's May 8, 2017 letter.  This letter is conclusory and fails to provide any explanation or reference to medical evidence to support her conclusion Evans is "not able to work at all" due

---

[15] When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 2012 WL 1592750 at * 11.  *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).  Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).  *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

to her mental impairments.  Nor does Ms. Venkarataman's letter offer any specific mental functional limitations.  Further, Evans fails to provide any explanation for failing to obtain this letter prior to the ALJ decision, particularly in light of her long-standing treatment relationship with Ms. Venkarataman. Accordingly, the Court finds Ms. Venkarataman's May 8, 2017 letter is not "material" for purposes of social security regulations and, further, that Evans has failed to demonstrate "good cause" for failing to obtain it prior to the ALJ decision.  Therefore, remand under sentence six is not warranted.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be AFFIRMED.


_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 21, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  _See United States v. Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474 U.S. 1111 (1986).**